**DRY ICE CORPORATION OF AMERICA v. JOSEPHSON et al.**

No. 4883.

District Court, E. D. New York.

Sept. 5, 1930.

Platt, Taylor & Walker, of New York City (Martin Taylor, Eli J. Blair, and Roswell P. C. May, all of New York City, of counsel), for plaintiff.

Clarke, Allen, Harper & Matthews, of New York City (Thomas G. Haight, of Jersey City, N. J., and John F. Neary, William F. Allen, and Daniel L. Morris, all of New York City, of counsel), for defendants.

CAMPBELL, District Judge.

This is an action brought by Dry Ice Corporation of America, to compel the transfer by the defendant Josephson to it of certain inventions made by him, as they allege he is bound to do by the terms of a contract made by Herman H.. Moore and Walter S. Josephson to Prest-Air Corporation, plaintiff's predecessor.

The plaintiff is a Delaware corporation. Herman H. Moore is a resident of Canada, and has never been served with process, and the court has not acquired jurisdiction as to him.

The defendant Walter S. Josephson is a resident of this district, and has appeared and answered, and the action has proceeded against him alone.

The defendant Josephson is an engineer and was engaged in the general practice of that profession from 1912 to 1922.

Herman H. Moore is a-doctor of medicine, who at all the times mentioned herein resided and still resides in Canada.

On an application filed in January, 1920, by Wallace Atcheson Delahey and George Whitefield Delahey, a patent subsequently issued on the so-called power bottle, items 1 and 3 of schedule A of the contract on which the suit is based.

This power bottle patent was in the Deco Metal Products Company of Toronto, and had been commercialized to some extent when in 1922 the said Dr. Herman H. Moore acquired from said company, for $5,000, an option to purchase that patent for $50,000.

Dr. Moore then met the defendant Josephson, who was a consulting engineer as well as engaged in manufacturing, and consulted Mr. Josephson about that patent, and Mr. Josephson, after testing the bottle for about two months, was so impressed with the commercial possibilities of the patent that he joined Dr. Moore in the purchase of said patent, in Dr. Moore's name, for $50,000.

On May 23, 1922, Mr. Josephson and Dr. Moore, having acquired said patent, formed the Prest-Air Corporation.

They did not transfer the said patent to the Prest-Air Corporation, but Dr. Moore entered into a license agreement with the Prest-Air Corporation covering said patent, in consideration of a minimum royalty of $50,000 a year.

Mr. Josephson and Dr. Moore then formed a corporation known as M. & J. Interests, Inc., to which corporation Dr. Moore transferred the said patent and the license contract with Prest-Air Corporation.

All of the capital stock of the Prest-Air Corporation was issued to Mr. Josephson, Dr. Moore, and M. & J. Interests, Inc., in consideration of the granting of said license to the said corporation, and less than one-half of said capital stock was by them donated back to Prest-Air Corporation and subsequently sold by Mr. Josephson to the public to raise capital.

The stock of M. & J. Interests, Inc., was not sold to the public, but was kept by Mr. Josephson and Dr. Moore for themselves.

The situation then was that the founders of the Prest-Air Corporation, Mr. Josephson and Dr. Moore, were entitled through the M. & J. Interests, Inc., to receive $50,000 a year minimum royalty for the use of the said power bottle patent.

Some of these royalties were paid, but the amount was not shown.

The so-called power bottle patent of Delahey was for an improvement in tire inflators, fire extinguishers, and the like, and it was stated in the specification that, "The objects of the invention are to permit of a gas being stored under pressure and being utilized when desired."

The gas with which the bottle was operated was liquid carbon dioxide $CO_2$, and from the very beginning the development plan was concerned with three phases of the use of carbon dioxide: First, the use of the expansion force of the compressed element as a source of power; second, the use of the chemical properties of the elements when released from compression; third, the use as a refrigerant of the low temperature developed in the process of expansion.

The power bottle was the foundation on which the development of the Prest-Air Corporation was based. Dr. Moore, Mr. Josephson, or M. & J. Interests, Inc., accumulated other devices, but they did not transfer them to Prest-Air Corporation.

On February 19, 1923, M. & J. Interests, Inc., granted a license to Prest-Air Corporation. Mr. Josephson and Dr. Moore held

other inventions, in the name of one or the other of them, for which they did not even grant a license to Prest-Air Corporation.

As early as October 3, 1922, Mr. Josephson filed an application, which was assigned to Dr. Moore on November 9, 1922, for an improvement in refrigerating devices, "whereby the compressed gas container which is provided for other purposes, such as the inflation of tires, etc., may also be used for the purpose of a readily portable refrigerating device."

The container referred to was the power bottle of the Delahey patent.

Dr. Moore did not assign that application to Prest-Air Corporation, or to M. & J. Interests, Inc., and therefore it was not included in the license from M. & J. Interests, Inc., to Prest-Air Corporation.

Notwithstanding its affinity with the power bottle, Dr. Moore held it in his name until January, 1924, when he assigned it to the B. M. J. Utilities, Inc., and Prest-Air Corporation acquired it through the acquisition of the stock of B. M. J. Utilities, Inc. It is item 17 of schedule A of the contract in suit (Plaintiff's Exhibit 4).

On January 18, 1923, an application was filed by Mr. Josephson "to make practical the use of the liquefied gas as a refrigerant by thermostatically regulating the escape of the gas from the containers in the novel manner hereinafter described."

Mr. Josephson did not assign this application to Prest-Air Corporation or M. & J. Interests, Inc., and it was not included in the license from M. & J. Interests, Inc., to Prest-Air Corporation, but in 1924 it was assigned to B. M. J. Utilities, Inc., and came to Prest-Air Corporation through its acquisition of the stock of B. M. J. Utilities, Inc. It is item 18 of schedule A of the contract in suit (Plaintiff's Exhibit 4).

On April 26, 1923, Mr. Josephson filed an application for an improved thermostatic valve, to be used in connection with a standard container of liquid carbon dioxide, "whereby the use of such a liquid as a refrigerant may be more efficiently accomplished."

This application was not assigned to Prest-Air Corporation or M. & J. Interests, Inc., and it was not included in the license from M. & J. Interests, Inc., to Prest-Air Corporation, but was in 1924 assigned to B. M. J. Utilities, Inc., and came to Prest-Air Corporation through its acquisition of B. M. J. Utilities stock. It is item 19 of schedule

A of the contract in suit (Plaintiff's Exhibit 4).

On February 1, 1923, Mr. Josephson entered into a five-year employment contract with Prest-Air Corporation. Notwithstanding the fact that this contract recited that Mr. Josephson had invented and developed various devices then being manufactured by Prest-Air Corporation, he had only up to that time invented the refrigerating device for the power bottle, and the device to make practical the use of $CO_2$ as a refrigerant, and had neither assigned nor licensed either of them to Prest-Air Corporation.

There was also a recital in that contract of Mr. Josephson's familiarity with the facts relating to the manufacture and sale of said goods, and of his being in a position to manage the affairs of the company in such a way as to promote its best interests, particularly if such management could extend over a term of years.

The company agreed to elect Mr. Josephson general manager and president for five years, and Mr. Josephson agreed "to give his time exclusively to the service of the party of the first part and to use his best endeavors to promote its interests in every way."

On February 15, 1923, a factory was leased at Hunters Point avenue, Long Island City, and on February 20, 1923, Mr. Josephson wrote Mr. August Heckscher that production would start in a week.

Mr. Josephson wrote on the subject of Prest-Air refrigeration to Mr. August Heckscher, in the early part of February, 1923, the device referred to being a thermostatic valve wherein the flow of liquid $CO_2$ was controlled "solely by the formation of an ice plug in the nozzle," the ice being $CO_2$ ice, which device was one of those invented by Mr. Josephson and not assigned to Prest-Air Corporation.

The valve in question was called the Prest-Air refrigerating nozzle, and Mr. Josephson, in telling of the ease with which it could be operated, referred to it as Prest-Air refrigeration.

Mr. Josephson also wrote, early in February, 1923, of the plan to erect a liquid carbonic plant "upon the completion of our financing," and clearly indicated that by the use of the word "our" he meant Prest-Air Corporation.

In February, 1923, Mr. Josephson sent Mr. Slate to Canada to continue development work on the refrigeration features, at a plant of a corporation of which Mr. Josephson was president and of which he had charge. Mr. Slate remained until July or August, 1923, and on his return worked at a Prest-Air Corporation laboratory, at 25 Washington street.

The work was pressed more actively in September, October, and November, and in December, 1923, the solid $CO_2$ was evolved.

Mr. Josephson pushed a stock-selling campaign during the year 1923, and kept the stockholders advised on the progress of the ice development work.

The financial condition of the Prest-Air Corporation went down as the experimental work on the refrigeration was being completed.

Difficulties had arisen in the manufacture of the power bottle which retarded the merchandising plan, and Mr. August Heckscher alone had furnished $90,000 before November, 1923, and more in the latter part of November in that year.

Mr. Herbert W. Brown invested $20,000 or $25,000 and with a view to investing more asked Mr. Lawrence, an associate, to make an investigation.

Mr. Brown returned from a trip abroad shortly before Christmas, and on December 21st received from Mr. Josephson a letter with a report of production and sales, and under the heading "Refrigeration" was suggested the possibility of branching out into:

Household refrigeration.

Railroad refrigeration.

Commercial refrigeration.

Refrigerated shipping containers.

Marine refrigeration.

Soda fountain service.

Doctors and hospital service.

Mr. Josephson magnified the possibilities of the subject of refrigeration, and Mr. Lawrence saw the $CO_2$ ice manufactured at the Prest-Air factory, at Long Island City, about the time Mr. Cusack was employed by the Prest-Air Corporation and worked on it.

Mr. Josephson, two days before he had written to Mr. Brown, had procured from Mr. Slate a license agreement to the M. & J. Interests, Inc., for the invention covering the use of $CO_2$ ice. Mr. Josephson had made no arrangements for the protection of the Prest-Air Corporation, but had made an arrangement with Mr. Slate that the latter would enter into a license agreement with M. & J. Interests, Inc., on any of these patents he would evolve.

At the time that Mr. Josephson was so glowingly describing Prest-Air ice to Mr. Brown, the Prest-Air Corporation had neither an assignment of nor a license under the Slate patent.

Mr. Slate's patent application was filed January 10, 1924, and on January 15, 1924, M. & J. Interests, Inc., assigned the license to Mr. Josephson individually, and on January 19th Mr. Josephson assigned the license agreement and three inventions claimed as his own to B. M. J. Utilities, Inc.

Two of these three inventions involved the thermostatic valve (the Prest-Air refrigerating nozzle); the third, the use of the automatic power bottle as a portable refrigerating device.

These applications were held in the name of Dr. Moore or Mr. Josephson, and therefore were not included in the license from M. & J. Interests, Inc., to Prest-Air Corporation, and with the Slate application comprise items 17 to 20, schedule A, of the contract (Plaintiff's Exhibit 4).

The Prest-Air Corporation was in such a condition that refinancing was an absolute necessity, if it was to continue.

A meeting was held at which Messrs. Heckscher, Stuckless, Brown, and Lawrence were present. Mr. Josephson was not at the meeting, but appeared thereafter.

Mr. Brown submitted a plan of forming a new company, and then for the first time the others learned from Mr. Brown that the Prest-Air Corporation did not own the Prest-Air automotive and other devices, nor the Prest-Air CO$_2$ processes.

Mr. Brown insisted on B. M. J. Utilities, Inc., retaining the patents and licenses which it held, but the others at the meeting insisted that the refrigerating patents must be assigned to Prest-Air Corporation.

Subsequent to the meeting, Mr. Josephson joined with the others in their efforts to persuade Mr. Brown that these patents must go back to Prest-Air Corporation.

On February 14, 1924, Dr. Moore's offer was accepted by the board of directors of Prest-Air Corporation, and the president and secretary were authorized to enter into a contract.

Employment contracts between the Prest-Air Corporation and Mr. Josephson, and the Prest-Air Corporation and Mr. Slate, respectively, were entered into, as was also an agreement between M. & J. Interests, Inc., and Prest-Air Corporation.

Finally the agreement (Plaintiff's Exhibit 4) in suit, between Dr. Moore and Mr. Josephson and Prest-Air Corporation, was executed, and Mr. Heckscher and others purchased $300,000 worth of stock.

Prest-Air Corporation continued the manufacturing of and advertising of the power bottle and demonstration and development work on refrigeration, which was concerned partly with increasing, and partly with decreasing, the amount of moisture in the sublimed gas.

Trouble was experienced with the dehydrating effect of solid CO$_2$ refrigeration, and various efforts were made to vary the amount of water.

It is apparent that in December, 1924, Mr. Josephson, during his employment, was experimenting with both the reduction and increase in the amount of water in solid CO$_2$, and that he believed that the ice manufactured by the Slate snow tank method contained too much water ice.

On December 6, 1924, Mr. Josephson filed his application for "Carbon-Dioxide-Freezing Apparatus, Method and Product," which resulted in patent No. 1,659,431, issued to Walter S. Josephson, assignor to Prest-Air Corporation, on February 14, 1928.

The patentee said:

"My present invention relates more particularly to freezing of carbon dioxide in a liquid state to form a cake of ice as distinguished from compressing carbon dioxide snow formed in the usual well-known manner by sudden release of liquid carbon dioxide under pressure."

This device included "freezing of the liquid carbon dioxide under relatively enormous pressure applied continuously throughout the freezing operation." The invention included apparatus for the making of carbon dioxide gas, the reduction of the same to liquid form, and the freezing of the gas in the liquid form.

This patent was assigned by Mr. Josephson to Prest-Air Corporation, as were also the foreign patents issued thereon.

After the application was filed for the foregoing patent, the name of the corporation was changed from Prest-Air Corporation to Dry Ice Corporation of America.

Notwithstanding the large sums spent in advertising, additional money having been put in during the year 1924, it was impossible to create a demand for the power bottle, and the automotive end of the business was small.

Mr. Josephson, on the suggestion that he do so, resigned in January, 1925.

Thereafter a new Delaware corporation was formed, with the same name, and the assets of the old corporation were transferred to the new one.

The refrigerating business of the corporation had increased enormously since January, 1925, millions of pounds of solid $CO_2$ having been manufactured.

After resigning from the corporation, Mr. Josephson engaged in a variety of activities and held offices in divers corporations.

Mr. Josephson says that in August, 1929, he "conceived the idea which resulted in Hydrice." In the fall of the same year it is shown that Mr. Josephson had a laboratory in New York, in which he had made dry ice.

He offered the plaintiff corporation a minority interest in his said invention for a large sum, before offering it to potential competitors.

Plaintiff's representatives examined the product and the manner in which it was produced, and contend that it was its own product, varied from commercial dry ice in daily use only in the degree of water found therein; such variations being no greater than are frequently found between different specimens of plaintiff's own product. Mr. Josephson and his expert witnesses contend that Hydrice is an improvement on dry ice and patentably different.

Mr. Josephson's offer to sell a minority interest, a circular to plaintiff's customers, called a "Christmas card," and Mr. Josephson's announcement "to the refrigerating industry," were considered by plaintiff as threats to invade the plaintiff's business field, and plaintiff commenced this suit and obtained the temporary restraining order.

Plaintiff contends that under the terms of the contract made between Dr. Moore and Mr. Josephson and Prest-Air Corporation, bearing date February 28, 1924 (Plaintiff's Exhibit 4), Mr. Josephson is bound to assign to plaintiff, as successor of the Prest-Air Corporation, the so-called Hydrice invention.

Defendant contends that he is not bound so to do, for the following reasons:

1. The language of the contract in suit relied upon does not relate to future inventions at all. It describes those indefinite and inchoate inventions theretofore made by Josephson, in the field of items 1 to 15, which inventions were not then capable of reduction to application form, or of any more specific designation.

2. The contract on its face shows that the patent applications that were to be assigned to the Prest-Air Corporation, under the clause in question (even if it relates to future inventions), were only those connected with, and related to, automotive devices and liquid carbon dioxide as a limited refrigerant, and did not apply to patents or applications in the field of solid carbon dioxide refrigeration.

3. The language of the contract, where it is substantially that of the offer, should be construed in the light of the offer, for the reason that under the action of the board of directors, the contract authorized is merely one necessary for the purchase of the property, in accordance with the offer.

4. The contract, if construed to relate to such inventions as Mr. Josephson might make during the rest of his life, irrespective of whether or not he is in the employ of the Prest-Air Corporation, lacks adequate consideration to support it, and is so inequitable that a court of equity would not decree specific performance of it.

5. Since, according to the testimony of the plaintiff, the product Hydrice is not new, and is of no value to them, a court of equity should not decree specific performance.

The first question to be considered is whether the terms of the contract are clear and unequivocal, or whether they are ambiguous.

Parol testimony cannot be received to vary the terms of a written instrument, but only to make plain the meaning if its terms are ambiguous.

The contract expresses the intentions of the parties, and in it all negotiations leading up to the making of the contract are merged, and there is no reason for considering the contract in the words of the offer made by Dr. Moore, unless the contract be ambiguous, in which event recourse might be had to the offer of Dr. Moore, to ascertain the meaning of the language of the contract, where it is substantially that of the offer.

The contract on which this suit is based (Plaintiff's Exhibit 4) has been accepted and ratified by the plaintiff, and it is not limited merely to ratifying the offer of Dr. Moore, by reason of the resolution accepting that offer, and the cases cited by defendant on that contention are not in point.

The contract on which this action is based (Exhibit 4) provides, in so far as is necessary for consideration at this time, as follows:

"Now therefore in consideration of the premises and the sum of One Dollar in hand paid by the said Prest-Air Corporation to the said Herman H. Moore, and the said Walter S. Josephson, the receipt of which is hereby acknowledged by the said Herman H. Moore and the said Walter S. Josephson, the parties hereto do agree as follows: The said Herman H. Moore and the said Walter S. Josephson do hereby, each for himself, severally sell, assign and transfer unto the said Prest-Air Corporation all the right, title and interest of each of them respectively, in and to any letters patent of the United States of America, the Dominion of Canada, or of any foreign country, which may hereafter be issued on any of the inventions enumerated in the annexed Schedule A, or any amendments thereto or improvements upon the devices therein mentioned, or to any extensions or renewals of said letters patent, or in any applications which may be filed, or letters patent which may be issued by or in behalf of the said Herman H. Moore and the said Walter S. Josephson, or either of them, for any other invention connected with, related to, or growing out of any Prest-Air device or Prest-Air Refrigerating device hereinbefore mentioned, all of which, without regard to the date when applied for or issued, shall be assigned and transferred to the said Prest-Air Corporation, its successors and assigns, without further cost or expense."

This contract on its face seems clearly to require Dr. Moore and Mr. Josephson, or either of them, to assign to Prest-Air Corporation, or its successor, the plaintiff, any other invention connected with, related to, or growing out of any Prest-Air device or Prest-Air refrigerating device hereinbefore mentioned.

The mention thereinbefore made was to patents and inventions enumerated in schedule A; therefore the words "hereinbefore mentioned" as so used in said contract must have been intended to mean those mentioned in schedule A.

That all of the devices described in schedule A were known as Prest-Air devices, whether patented or not, and whether the Prest-Air Corporation was the owner or merely the licensee, or the owner or licensee, by reason of being the owner of all of the capital stock of B. M. J. Utilities, Inc., was clearly shown in the evidence, and had been so denominated at various times by Mr. Josephson.

This applies with equal force to the refrigerating devices, whether inventions, applications, patents, or licenses, which had not been assigned to Prest-Air Corporation until by this contract, or by other contracts, about the time of the making of the contract Exhibit 4, but had been held in the name of Dr. Moore, Mr. Josephson, M. & J. Interests, Inc., or B. M. J. Utilities, Inc., as they were all known as Prest-Air devices.

From all the evidence it seems clear that Prest-Air refrigerating devices were utilizing $CO_2$ ice, and therefore Hydrice, so called, the invention, and the applications of the defendant Josephson which plaintiff seeks to have assigned to it, are connected with, related to, or growing out of a Prest-Air device mentioned in schedule A.

Defendant in attempting to show that the contract (Exhibit 4) does not relate to future inventions, and even if it does relate to future inventions, it relates only to the automotive devices and liquid carbon dioxide as a limited refrigerant, and does not apply to patents and applications in the field of solid carbon dioxide refrigeration, refers first to the face of the contract and attempts to limit the meaning of the words "hereinbefore mentioned," not to schedule A, but to the items 1 to 15, both inclusive, of schedule A, and second to item 16 of schedule A, which reads as follows:

"16. All the right, title and interest of Herman H. Moore, Walter S. Josephson and M. & J. Interests, Inc., in and to any letters patent of the United States of America, the Dominion of Canada, or any foreign country, which may hereafter be issued on any of the foregoing applications, or any amendments thereof, or improvements upon the devices therein mentioned, or any extensions or renewals thereof, or in any applications which may be filed or letters patent which may be issued by or in behalf of the said Herman H. Moore, Walter S. Josephson and, or M. & J. Interests, Inc. for any other invention connected with, related to or growing out of any Prest-Air device or Prest-Air refrigerator hereinbefore mentioned, all of which, without regard to the date when applied for or issued, shall be assigned and transferred to the Prest-Air Corporation without further cost or expense."

I cannot, however, agree with the contention of the defendant that the general words of the contract are limited by the wording of item 16, because the wording of item 16 could not apply to items 17 to 21, both inclusive, of schedule A, for the reason that items 17, 18, and 19 of schedule A are applications for patents then belonging to B. M. J. Utilities, Inc., and items 20 and 21 are licenses under

applications belonging to Thomas B. Slate, which licenses belonged to B. M. J. Utilities, Inc., and yet all of these items were known as Prest-Air devices, and the Prest-Air Corporation intended to control items 17, 18, 19, 20, and 21 by its acquisition of all the capital stock of B. M. J. Utilities, Inc., and by the general terms on the face of the contract sought to protect itself against any applications which might be filed or letters patent that might be issued by or in behalf of said Dr. Moore and said Mr. Josephson, or either of them, for any other invention connected with, related to, or growing out of any of the Prest-Air refrigerating devices of items 17 to 21, both inclusive, as well as in items 1 to 15, both inclusive, and therefore used the words "Prest-Air device, or Prest-Air Refrigerating device hereinbefore mentioned," and by those words referred to schedule A as a whole, and not only to items 1 to 15, both inclusive, as the only way in which they had been thereinbefore mentioned was by the description schedule A, and it must be conceded that schedule A consists of 21 items.

I find nothing ambiguous in the contract (Exhibit 4), and therefore nothing to be explained by parol evidence; but if I am in error on this point, the evidence in this case shows that it must have been the intention of the plaintiff to protect itself to the full extent.

The whole course of events, the method of controlling patents and licenses, and the discovery of the investors that many of the most important had not been turned over to the Prest-Air Corporation, and the attempt to withhold the Prest-Air refrigeration devices from the corporation and keep them in B. M. J. Utilities, Inc., which was successfully opposed by those who were to furnish the money so necessary to the continued life of the corporation, must have suggested the necessity of full protection which they certainly were seeking.

The contention that the offer of Dr. Moore must limit and control the interpretation of the contract, and that a consideration of that offer shows that the agreement to assign related only to items 1 to 15, both inclusive, is not sustained because even schedule A, as it appears in the contract, is not exactly the same as schedule A in the Moore offer, and the change in the schedule necessitated the change in the general wording of the contract to make it inclusive.

The intent to make the contract inclusive, and by the use of the words "Prest-Air device, or Prest-Air Refrigeration device," to cover all the items of schedule A, is shown by the other contracts executed about the same time, the contract of February 25, 1924, between Mr. Josephson and B. M. J. Utilities, Inc., that of February 28, 1924, between M. & J. Interests, Inc., and Prest-Air Corporation, and that between B. M. J. Utilities, Inc., and Prest-Air Corporation, of August, 1924.

Defendant contends that the making of the Josephson contract of hiring shows that it was not the intent of the contract (Exhibit 4) to relate to future inventions, because there would be no reason for the assignment provision in the contract of hiring, if the provision for assignment in the contract (Exhibit 4) was broad enough to cover any other invention connected with, related to, or growing out of any Prest-Air device, or Prest-Air refrigeration device, mentioned in schedule A.

So much of the contract of hiring, between Prest-Air Corporation and Mr. Josephson (Exhibit F), as is necessary for consideration, reads as follows:

"Do assign and transfer to the said Prest-Air Corporation, its successors and assigns, all my right, title and interest in and to any inventions or processes which I may at any time during the course and period of my employment by said Prest-Air Corporation evolve or create relating to Prest-Air devices or Prest-Air Refrigeration, and in and to any patent rights in the United States or elsewhere, which I may receive or to which I may be entitled by virtue of such inventions or processes."

From a reading of this contract it is apparent that the contention of the defendant is not sustained, because in drawing the contract (Exhibit 4) the scrivener was careful to limit the assigning clause to inventions connected with, relating to, or growing out of Prest-Air devices, and Prest-Air refrigeration devices mentioned in schedule A, whereas in the contract of hiring the assigning clause has no such limitation but relates to any inventions or processes that Mr. Josephson may evolve or create during the term of his employment, relating to Prest-Air devices, or Prest-Air refrigeration, and patents he may receive or be entitled to.

This contract, as I read it, would require the assignment of any invention or process, evolved or created during the period of employment, relating to a Prest-Air device, or Prest-Air refrigeration, even if the device was not mentioned in schedule A, of Exhibit 4.

The hiring contract when thus construed

is further evidence of the intention of the Prest-Air Corporation to obtain full protection, and these two contracts clearly differentiate between an agreement for all times limited to inventions connected with, relating to, and growing out of, certain designated inventions, applications, and patents, and an agreement for a limited period of hiring, limited to inventions or processes evolved or created, relating to a general subject.

Defendant contends that an assignment in gross of future inventions is not looked upon by the courts with favor.

No citation of authorities is necessary to sustain that proposition. It is the law. In the instant case, however, the agreement covers a limited field of future inventions, and the cases cited by the defendant do not seem to be in point.

Further, while Mr. Josephson has made some inventions, he certainly has devoted much more of his time to working as a business man than to making inventions, and he was a stockholder of the corporation with which he contracted and financially interested in its success.

In Aspinwall Manufacturing Co. v. Gill (C. C.) 32 F. 697, at page 701, Mr. Justice Bradley said:

"Where the inventor is connected in business with the party making such stipulation, or is interested in the profits arising from the business in which the invention is used, the arrangement seems to be altogether unobjectionable."

The agreement to assign future inventions, applications, and patents in the instant suit did not constitute a mortgage upon the future operation of a man's brain, but was intended to safeguard a particular business, and although it was not limited as to time, it was valid and specific performance may be decreed. Chadeloid Chem. Co. v. H. B. Chalmers Co. (C. C. A.) 243 F. 606.

The defendant further contends that contracts are construed most strongly against the party that draws the contract.

Unquestionably that is the law and no citation of authority is required; but it seems to me to have no application in the instant case, because the attorney who drew the contract, as testified by Mr. Josephson, was his personal attorney as well as the attorney for the corporation.

He was brought into the employ of the corporation by Mr. Josephson before Mr. Heckscher became interested.

If the allegation of the affidavit made by Mr. Josephson is to be believed, he must have been represented, as he therein said, referring to a draft of the contract, "It was not acceptable to counsel either for deponent or for the Prest-Air Corporation."

Furthermore, it has not been shown that there is any ambiguity in the contract, but on the contrary it seems to clearly express the intent of the parties on its face.

The defendant's next contention is that the contract lacks adequate consideration to support the assignment of future inventions, and will not be enforced to that end by a court of equity.

The contract was founded on a valuable consideration.

In determining the adequacy of that consideration, we must be governed in a large degree by the conditions then existing and the benefits then obtained, and not by the conditions now existing, after the expenditure of money and effort for a term of years to develop what then was undeveloped, and find for it a market.

It is true that Dr. Moore and Mr. Josephson had purchased the power bottle patent for $50,000, and had put $10,000, and Mr. Brown $5,000, into the development of the refrigeration devices, and that under the license agreement with Prest-Air Corporation, they were entitled to a minimum royalty of $50,000 per annum.

It is also true that they had received some royalty, the amount not shown, and that they held a majority of the stock of the Prest-Air Corporation, for which they had not paid cash but simply had given the power bottle license.

The power bottle was not a success commercially, and notwithstanding the investment of over $100,000 by Mr. Heckscher, and $20,000 or $25,000 by Mr. Brown, the corporation was in danger of going into the hands of a receiver, and in dire need of a large cash investment.

Unless such cash investment could be secured, Dr. Moore and Mr. Josephson were threatened with a heavy loss.

Under these conditions the payment of $65,000 in cash, of which $5,000 went to Mr. Brown, and the benefit that they received in the added value of their stock in a properly financed concern, was certainly substantial.

Any one under those conditions would be substantially compensated by receiving the amount which he had paid out, the loss of which was very seriously threatened, not

counting the benefit which would be received by the added value of his stockholding in a properly financed corporation, instead of one on the verge of a receivership.

I have given no consideration to the 20,000 shares of common stock of Prest-Air Corporation, which also formed part of the consideration, as Dr. Moore and Mr. Josephson had agreed as part of the plan of refinancing to donate that to be used in bonusing sales of preferred stock.

I can see nothing unfair or unconscionable in the contract. On the contrary, the consideration was adequate to support the assignment of future inventions.

The defendant Josephson was in fact a promoter and business man rather than an inventor.

He had induced Messrs. Heckscher, Brown, and others to invest in the corporation, and the corporation was on the verge of a receivership and could only be saved by bringing into the corporation a large sum of money.

If this was not done, the loss of the defendant would have been great, as he would not only have lost the cash he had invested but also the value of his stockholding, and this would not have been offset by the value of the automotive patents, or the royalties on the power bottle patent, as it had been demonstrated that it was impossible to create a sizable market for the power bottle.

The refrigeration devices could not have been placed on the market without bringing in the large capital required.

Under these conditions, it seems to me that the defendant received substantial consideration for the agreement (Exhibit 4), including the agreement to assign, the effect of which was to remove the defendant Josephson from the field as a promoter and inventor of the very limited line of Prest-Air devices and Prest-Air refrigeration, which was being taken over for development by the corporation, strengthened by the new money which was being put into it.

Defendant Josephson seems to place great reliance on a circular letter to the stockholders of the Prest-Air Corporation, by Mr. Norcross, its president, dated January 2, 1925.

Allowing for the natural pride in his short administration as president, and a desire to present the affairs of the corporation in the best possible light, it must not be forgotten that Mr. Norcross did not come to the presidency until after the contract (Exhibit 4)

had been executed, and considering all the evidence I distinctly disagree with him when he said, "the corporation acquired valuable patent rights for a nominal consideration."

No hardship or injustice will be imposed on Mr. Josephson if he is compelled to live up to his agreement, but, on the contrary, great hardship will be imposed on the plaintiff and its stockholders who furnished the money which saved the corporation from ruin, relying on the contract (Exhibit 4).

Defendant Josephson further contends that a court of equity will not compel the assignment of an invalid patent, or of one that is of no value to the plaintiff.

This contention, while generally good law, seems to be without merit in the present case.

I am not now engaged on a trial involving the validity or infringement of defendant Josephson's alleged invention, and it seems to me to be sufficient that defendant values it at a quarter of a million of dollars, to show that it will have value to plaintiff.

That plaintiff's representatives may have opinions adverse to the validity of defendant's alleged invention, and the value thereof, does not make it invalid or valueless, and surely if it clearly comes under the description of inventions which defendant agreed to assign, equity should relieve the plaintiff from loss and damages which it would suffer if such invention should be held by defendant, as the opinions of the experts called on his behalf strongly supported validity, and if valid there can be no question but that it is valuable.

The cases cited by the defendant do not appear to be in point.

■ The last point made by the defendant is, in effect, that the conveyance of Hydrice inventions by defendant Josephson to plaintiff should not be compelled, because they are not related to, or connected with, nor do they grow out of, the inventions of any of the twenty-one items of schedule A.

Again, let me call attention to the fact that the court is not engaged in a trial of the validity or infringement of the alleged invention of the defendant and the product called Hydrice. The question before the court is whether the Hydrice devices are related to, connected with, and grow out of Prest-Air refrigerating devices. Wege v. Safe-Cabinet Co. (C. C. A.) 249 F. 696, at page 699.

The contract in suit (Exhibit 4) was entered into about six weeks after Mr. Slate filed his application on January 10, 1924.

No patents had issued on that application at the time, and none issued for a long time thereafter.

While it is a fact that a number of patents issued on that application, the parties' contract was not limited to such patents, but was made with reference to the field disclosed in the applications.

That the work of Mr. Slate was with reference to a Prest-Air device, or to Prest-Air refrigeration, has been clearly pointed out, and was so denominated by the defendant Josephson himself prior to the making of the contract.

The field of the Slate application (Plaintiff's Exhibits 13, 14, 15) includes the following:

1. A refrigerant consisting of carbon dioxide snow compressed into cakes.

2. Method of and apparatus for making solid carbon dioxide.

3. The method of using solid carbon dioxide as a refrigerant.

4. Apparatus for using solid carbon dioxide as a refrigerant, consisting of the following:

(a) Refrigerator car apparatus.

(b) Container for transporting small packages of perishables.

(c) Home refrigerator.

The field of the Hydrice application is (Defendant's Exhibit V):

1. A refrigerant-hydrated solid carbon dioxide.

2. Method of and apparatus for making Hydrice.

3. Method of using Hydrice as a refrigerant.

4. Apparatus for using a refrigerant such as Hydrice solid carbon dioxide, consisting of the following:

(a) Refrigerator car apparatus.

(b) Container for transporting small packages of perishables.

(c) Home refrigerator.

Both are built around the refrigerant carbon dioxide ice.

The problems of business are the same for both plaintiff and defendants.

The employment of $CO_2$ is essential to both.

The commercial outlets of both parties are the same.

Both Messrs. Slate and Josephson's claims are for a form of solid dioxide.

Mr. Slate's claim was for compressed snow constituting a solid.

Mr. Josephson's claim was for hydrated solid carbon dioxide.

There was water in the Slate product.

There is water in the Josephson product.

Plaintiff tries to remove the water from its product.

Mr. Josephson deliberately introduces water into his product while the gas is in vapor form.

Both relate to refrigeration by solid $CO_2$, and let the differences be what they may, Mr. Josephson's application is related to, connected with, and grows out of the claim of Slate for refrigeration by the use of solid $CO_2$.

The plaintiff is entitled to specific performance of the contract.

A decree may be entered in favor of the plaintiff, as prayed for in the bill of complaint, with costs and the usual order of reference.